UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
**PREEMINENT PROTECTIVE**     )
**SERVICES, INC.,**           )
                              )
     **Plaintiff,**    )
                              )
   v.                      )   Civil Action No. 18-502 (RMC)
                              )
**SERVICE EMPLOYEES**         )
**INTERNATIONAL UNION,**      )
**LOCAL 32BJ,**               )
                              )
     **Defendant.**    )
_____)

**MEMORANDUM OPINION**

        Preeminent Protective Services, Inc. provides physical security services at St. Elizabeth's Hospital, a public psychiatric facility in the District of Columbia. Preeminent complained in the District of Columbia Superior Court that an arbitration award, after grievance arbitration, exceeded the arbitrator's powers and must be vacated. The Union removed the case to federal court and defends the award. Such an apparently traditional dispute presents a host of uncertain legal puzzles: whether Preeminent timely filed its complaint; whether the D.C. Arbitration Act or federal labor law provides the statute of limitations; and whether the arbitrator exceeded his authority when he crafted a remedy different from the one written into the collective bargaining agreement.

        This Court concludes that the formal rules of the Superior Court govern filing; the time limits in the D.C. Arbitration Act apply, so that Preeminent's complaint was timely filed; and the Arbitrator exceeded his powers by ordering a remedy that is contrary to the express terms of the collective bargaining agreement by which the parties agreed to be bound.

1

## I. FACTS

### A. Background

Preeminent is a small minority business enterprise that provides physical security services to commercial customers. Ex. A, Notice of Removal, Arbitration Decision [Dkt. 1-1] at 50.[1] It moved into the public sector when it was awarded a subcontract to provide physical security services at St. Elizabeth's Hospital (St. E's). Due to the business collapse of its predecessor, Preeminent took over the contract five days early, at midnight on February 10, 2017. *Id*. As is common, it inherited its predecessor's employees and signed a preexisting collective bargaining agreement with the Service Employees International Union, Local 32BJ (Union or SEIU): the 2016 Washington D.C. Public Sectors 1 and 3 Security Agreement (the CBA). *Id*. at 51.

Officer Larry Moore, a Preeminent security officer who is represented by SEIU, was suspended pending investigation on February 20, 2017, and terminated, effective February 23, 2017. *Id*. Officer Moore was then discharged for abandoning his post and other alleged infractions related to his failure to remain on post, mid-shift, until a replacement could be found. *Id.* Officer Moore had told his supervisor, Lead Security Officer Annie Price, at the 8:00 a.m. start of his shift—when he was coughing and she inquired—that his asthma was bothering him but that he could work because he had taken his child's medication. *Id*. at 53-54. His supervisor questioned him about his ability to work more than once but he insisted that he could work and that he needed to earn his paycheck. *Id*.

---

[1] Citations to Ex. A, Notice of Removal, refer to the Electronic Case Filing (ECF) page numbers. Exhibit A consists of multiple documents. As relevant here, those documents are: (1) the initial Motion/Complaint to Vacate Arbitration Award and Superior Court case assignment materials at pages 1-14; (2) the CBA at pages 15-42; the Arbitration Decision at pages 43-73. All further cites to Exhibit A contained herein refer to the document title and ECF page number.

However, Officer Moore sent a text message to Lead Officer Price at about 11:38 a.m. telling her that he needed to leave at noon; she responded at about 11:50 a.m. and told him to wait until she could get a replacement. *Id*. at 54. Officer Moore texted Lead Officer Price again at about 12:08 p.m., telling her that he could not wait longer and was leaving. *Id*. Upon reading his text message, she immediately called Gate 6 at St. E's to learn if he had driven out yet and was advised that Officer Moore had left already through Gate 5. *Id*. Lead Officer Price replaced Officer Moore herself for the remainder of his 8 a.m. to 4 p.m. shift. *Id*. at 57. When Officer Moore called after 2:00 p.m. to ask if he should return to work, she told him that his shift was covered and not to return. *Id*. That was the last day Officer Moore worked for Preeminent at St. E's.

### B. Terms of City-Wide Security Services Regulation

A City-Wide Security Services Contract, DCAM-12-0031 (City-Wide Contract), covers all physical security services provided to the District of Columbia and its facilities. Its relevant terms govern Preeminent's work as a subcontractor to a direct contractor to D.C.:

> STAFFING AND POST ASSIGNMENTS
>
> \* \* \*
>
> C.6.3 The Contractor's employees['] duties shall include, but are not limited to, serving at a fixed post, making rounds on foot or by motor vehicle, escorting persons on government-owned and leased property, screening persons, packages, and other items both electronically and physically, if necessary, and helping visitors and government clients by answering questions and providing directions. The duties for each assigned post will include Post Orders that include the performance requirements of the duty station. The Contractor shall ensure Post Orders are adhered to at all time [sic]. Any deviation from the Post Orders requires a written confirmation of permission from the COTR [contracting officer's technical representative].
>
> \* \* \*

C.6.4.4 If during a site inspection, it is determined a Contractor employee assigned to a post does not meet the requirements, as outlined in District of Columbia Municipal Regulations, Title 6A, paragraphs C.3.8.7 of this contract, or the Post Orders, or if a post is otherwise not covered or vacant, the post will be considered unmanned (vacant). The COTR will issue a written notification to the Contractor and liquidated damages will be assessed in accordance with Section H.15.

[ . . . . ]

C.9.6 The Contractor shall distribute and abide by the approved orders. Except for emergencies, no deviations from post orders shall be made. The post order shall define the basic work to be performed at each post including the exact hours of duty, the time and location of movements of roving patrol posts, and detailed specific responsibilities for each fixed post.

\* \* \*

REMOVAL OF CONTRACTOR'S EMPLOYEE FROM A POST

C.19.1 The Contractor acknowledges that it is responsible for ensuring that all employees comply with all directives issued by the COTR. In addition, the Contractor agrees to maintain satisfactory standards of employee competency, conduct, appearance, and integrity, and shall be responsible for taking such disciplinary action as is deemed necessary with respect to its employees.

C.19.2 The Contractor shall not allow continued work by, or assignment to work of, employees deemed physically or mentally unfit, incompetent, careless, insubordinate, or whose continued employment under the contract is deemed by the COTR to be contract to the public interest, or inconsistent with the best interests of the Government of the District of Columbia. In situations deemed appropriate by the COTR, the COTR, in his or her sole discretion, may summarily direct the Contractor to remove its employee from a facility and the Contractor shall remove such employee immediately and supply a replacement with no lapse in coverage.

[ . . . . ]

C.19.4 The Contractor shall be required to dismiss such employees [specified in C.19.3-C.19.3.6] within a timeframe ranging from "immediately" to "within a week," as specified by the COTR. Any employee so dismissed shall at no time be eligible to work under this contract.

\* \* \*

Arbitration Decision at 47-49 (citing City-Wide Contract).

In addition, Preeminent security officers are subject to the Preeminent Standards of Conduct Policy, which state, in relevant part:

> While not intended to list all forms of behavior that are considered unacceptable in the workplace, the following are examples of rule infractions or misconduct that may result in disciplinary action, including termination of employment:
>
> - Any violations of Post Orders
> - Any violation of Contract Policies
> - Sleeping or malingering on post
> - Conduct Unbecoming
> - Insubordination
>
> \* \* \*
>
> - Remain on duty until properly relieved. Never abandon or desert your duty post.

*Id.* at 49-50 (citing Preeminent Protective Services, Inc. PPS-625 – Standards of Conduct Policy, Code of Conduct).

### C. Applicable Terms of the Collective Bargaining Relationship

The CBA between Preeminent and SEIU provides in relevant part:

> The Union recognizes that the Employer provides a service of critical importance to the customer. If a customer or tenant demands that the Employer remove an Employee from further employment at an account or location, the Employer shall have the right to comply with such demand. However, unless the Employer has cause to discharge the employee, the Employer will place the employee in a job at another account or location covered by this Agreement without loss of seniority or reduction in pay or benefits. If the Employer has no other accounts or locations under this Agreement where there are positions at the employee's same wage rate and benefits, the employee shall be placed at another account or location of the Employer ("Other Location") in a lower wage category, or where there are lesser benefits; or, at the employee's option, the employee may be laid off with the right, subject to the Employer's suitability determination, to fill positions that become available

> within three (3) months if the Employer obtains, or a vacancy occurs at, another account subject to this Agreement where the wage rate and benefits are at least equal to the wage rate and benefit previously enjoyed by the employee. When informed of the possibility of a layoff under this paragraph, the employee shall have ten (10) days in which to notify the Employer if he or she wishes to accept a position with the Employer at another location. Nothing herein shall require the Employer to place an employee in a position for which the employee is not qualified.

CBA at 21-22.

### D. Procedural History

After Officer Moore was terminated, SEIU grieved the discharge. When the parties failed to settle the grievance, it was duly brought before an arbitrator, who ordered reinstatement and full back pay for Officer Moore and ordered Preeminent and the Union to ask D.C. jointly to allow Officer Moore to return to work. The arbitrator issued his decision on November 9, 2017. *See* Arbitration Decision at 43-73.

Plaintiff's counsel submitted its first pleading in this case to CaseFile*Xpress*, an outside vendor used by the Superior Court for such filings, seeking to vacate the arbitrator's award. The date and time of the submission of Plaintiff's Motion/Complaint to Vacate Arbitration Award was Wednesday, February 7, 2018 at 1:59:54 p.m. Eastern Time. *See* Ex. 1, Mem. in Opp'n to Cross Mot. to Enforce Arbitration Award (Opp'n) [Dkt. 9-2]. In return, counsel received an "Acknowledgment of e-Filing" from the vendor which stated that "filing information has been received and will be transmitted to the court." *Id.* In fact, the Clerk's Office at the Superior Court rejected Plaintiff's Motion/Complaint because it did not comply with the Superior Court Rules of Civil Procedure.[2] *See* Opp'n at 3 n.1; D.C. Super. Ct. R.

---

[2] At she stated at the hearing on July 12, 2018, Plaintiff's counsel was initially uncertain as to whether she should file a motion or a complaint; when she sought guidance from the Clerk's Office in the Superior Court, she received differing answers. Thus, the document was styled as a

6

10(b)(2) (requiring that every motion contain a caption including the addresses of all parties). Plaintiff's counsel was advised about a week later that the Motion/Complaint had been rejected, whereupon it was promptly amended to include addresses and re-filed on February 14, 2018. *See* Am. Opp'n to Resp't's Cross Mot. to Confirm Arbitration Award [Dkt 10] at 3 n.1 ("The D.C. Superior Court clerk's office requested that the motion, treated as a complaint, be re-filed with the parties' addresses within the style of the motion (rather than on the case information sheet). Preeminent complied and refiled [sic] the pleading on February 14, 2018."). It is this second filing, showing the parties' addresses, which appears as the publicly available initial pleading on the Superior Court electronic docket. *See* Motion/Application Regarding Arbitration Award, *Preeminent Protective Services, Inc. v. Service Employees International Union Local 32BJ BFH*, 2018 CA 001102B (D.C. Super Ct. Feb. 14, 2018).

## II. TIMELINESS

The threshold issue in this case is whether Preeminent timely filed its motion to vacate in D.C. Superior Court. The Superior Court first introduced electronic case filing in approximately 2007 and gradually expanded its use so that all civil cases must now be filed electronically unless the plaintiff is appearing *pro se*. Under D.C. law, a party to arbitration must *file* its complaint seeking vacatur of an arbitration decision within ninety (90) days of receiving the arbitrator's opinion. D.C. Code § 16-4423(c).[3] In this case, that ninetieth day fell on February 7, 2018.

---

motion/complaint. As it was the pleading that initiated the lawsuit, the Clerk's Office required a document that met the requirements of the local rules for a "complaint."

[3] The relationship between Preeminent and SEIU is governed by federal labor law; indeed, § 301 of the LMRA provides the Court's jurisdiction over this case, granting original jurisdiction to federal courts over actions for alleged violation of collective bargaining agreements between an employer and a labor organization representing employees. *See* 29 U.S.C. § 185; 28 U.S.C. §§ 1441(a), 1446. However, the LMRA does not specify a statute of limitations. Instead, courts

7

At oral argument on the Union's motion to dismiss, Plaintiff's counsel submitted the first page of her first version of the Motion/Complaint, which is time stamped as filed in the Superior Court on February 7, 2018. *See* Hearing Ex. 2 [Dkt. 14]. That pleading is not available on any public source because the Superior Court Clerk's Office refused to accept it. It can be found by counsel only in the private data file that shows all documents her law firm has filed in Superior Court. Union counsel was not privy to the first Motion/Complaint document and argues that the corrected Motion/Complaint, accepted for filing on February 14, 2018 and placed on the public docket, was filed too late. It is stamped, nonetheless, in the upper right-hand corner, "Filed D.C. Superior Court 02/07/2018 13:59 PM Clerk of the Court." *Id*.

The Union cites an Administrative Order issued by the Chief Judge of the Superior Court to support its position. It notes Administrative Order 05-04 (eFiling With IJIS Implementation), E.F. Rule 6, which states, in part:

> Any document filed electronically shall be considered as filed with the Superior Court when it is submitted for eFiling to the Vendor and transmission is completed ("authorized date and time"). . . . The Vendor is hereby appointed the agent of the Clerk of Superior Court as to the electronic filing and service of any filing in eFile. Upon receipt of a filing, the Vendor shall issue a confirmation that the filing has been received. The confirmation shall serve as proof that the filing has been filed. A filer will receive subsequent notification from the Superior Court's Clerk's Office that the filing has been accepted or rejected by the Clerk's Office for docketing and filing into the Superior Court's case management system (CaseView). *If the electronic filing is not filed because of a failure to process it through no fault of the sending party, the Court may enter an order*

---

have found that the timeliness of complaints alleging breach of a collective bargaining agreement is governed by the appropriate state limitations period. *See United Auto. Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 704-05 (1966*); United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56 (1981). Because Preeminent seeks to vacate an arbitration award, the Court finds that the D.C. Arbitration Act applies. *See Local 689, Amalgamated Transit Union v. WMATA*, 249 F. Supp. 3d 427, 437 (D.D.C. 2017) ("The 90-day period found in the District of Columbia Arbitration Act, D.C. Code § 16-4423(c), is appropriately borrowed for a motion to vacate an arbitral award governed by the federal common law.")

8

> *permitting the document to be filed nunc pro tunc to the date it was sent electronically* . . . .

*See* Hearing Ex. 1 [Dkt. 13] at 15 (emphasis added).[4] The Union emphasizes the highlighted language, which it interprets as meaning that pleadings containing errors made by the sending party, *i.e.*, the absence of the parties' addresses in the caption), can be rejected by the Clerk and cannot be filed with a grace period *nunc pro tunc*. *See* Def.'s Reply to Pl.'s Opp'n [Dkt. 12] at 7. Preeminent responds that it made a timely filing, as proved by the date stamp on its first Motion/Complaint. Opp'n at 2-3.

This question has a straight-forward answer found in the Superior Court Rules of Civil Procedure and not the sources cited by the parties. Rule 5 governs Serving and Filing Pleadings and Other Papers and provides specifically, "[e]lectronic filing is complete on transmission, unless the filing party learns that the attempted transmission was undelivered or undeliverable." D.C. Super. Ct. R. Civ. P. 5(b)(5)(A) (2017). This has been the rule in the District of Columbia for some years. *See Parker v. K&L Gates, LLP*, 76 A.3d 859 (D.C. 2013). In a case in which he was compelled to arbitrate, Plaintiff Parker timely filed an electronic appeal and received an electronic confirmation on September 21, 2011. *Id*. at 863. The motion was subsequently rejected and then refiled. *Id*. From this history, the D.C. Court of Appeals "conclude[d] that Mr. Parker's motion is properly understood to have been filed on September 21, 2011, the date that the electronic confirmation initially showed it as having been filed." *Id.* In *Parker,* the D.C. Court of Appeals quoted the exact same language now in Rule 5(b)(5)(A): "filing by electronic means is complete upon transmission, unless the party making the transmission learns that the attempted transmission was undelivered or undeliverable." *Id.*

---

[4] Citations to Hearing Ex. 1 refer to the ECF page numbers.

The Union's interpretation of the Administrative Order is logical but inapplicable given the language of Rule 5 and the authoritative interpretation of the District of Columbia Court of Appeals. The Court concludes that Preeminent timely filed its Motion/Complaint, and that motion is now ripe for review.

### III.  MERITS

#### A. Legal Standard

Since Congress enacted the National Labor Relations Act of 1935 (NLRA), 29 U.S.C. § 151 *et seq.*, courts have interpreted and enforced the federal common law applicable to collective bargaining agreements. *See, e.g., Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) ("[T]he substantive law to apply . . . is federal law, which the courts must fashion from the policy of our national labor laws.").

The linchpin of U.S. labor relations is the process of binding arbitration before a neutral arbitrator, which enables the resolution of economic disputes without coercive means (strike or lockout) during the term of a collective bargaining agreement. More than half a century ago, the Supreme Court set out the broad principles governing labor arbitration in the *Steelworkers Trilogy*.[5] Foremost among these principles is respect for arbitration provisions in collective bargaining agreements, whereby the parties' grievances are put to a neutral arbitrator for resolution instead of resort to "economic warfare," such as strikes or lockouts. *See Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. at 577-78. "Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs

---

[5] The *Steelworkers Trilogy* comprises *Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S 593 (1960).

and desires of the parties." *Id*. at 580. The arbitrator "has no general charter to administer justice for a community which transcends the parties," but rather is "part of a system of self-government created by and confined to the parties." *Id*. at 581 (citation omitted).

In keeping with the central role of private arbitration in labor law, judicial review of labor arbitral awards is "extremely limited," *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (citation omitted), and labor arbitration awards are awarded great deference. *See Madison Hotel v. Hotel & Rest. Emps., Local 25*, 144 F.3d 855, 855-59 (D.C. Cir. 1998) (en banc) (citation omitted). Because Preeminent and SEIU agreed to grievance arbitration, and therefore agreed to bind themselves to an arbitrator's interpretation of their collective bargaining agreement, the Court may conduct only a narrow review of the arbitration award. *See Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. at 596 ("The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the award."). However, an arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id*. at 596-97; *see also Madison Hotel v. Hotel & Restaurant Emps., Local 25*, 144 F.3d at 858-59 ("An arbitrator cannot, for instance . . . ignore the contract and dispense his own brand of industrial justice.") (citation omitted). This is the case where an arbitrator's words reveal that he has gone beyond interpreting and applying the parties' agreement. *See Hay Adams Hotel LLC v. Hotel & Rest. Emps., Local 25, Unite Here Int'l Union*, No. 06-968, 2007 WL 1378490, at *5 (D.D.C. May 9, 2007).

## B. Arbitration Award

The facts that the Arbitrator found critical to his conclusions were that Preeminent had just succeeded to the physical security contract at St. E's and: (1) "before the Employer

11

*strictly can enforce* the Post Orders—which had been in place under the predecessor security contractor, BRSS, but had *not been enforced strictly*—the Employer properly must make it known to the Security Officers . . . that, from that point on, strict enforcement of the Post Orders . . . will be the new rule," Arbitration Decision at 69-70; (2) "the Employer failed to take into proper account the Grievant's attempts to secure relief through Lead Officer Price before he left to obtain appropriate medical treatment before he was in the position of leaving the site in an ambulance as an undisputed 'emergency,'" *id.* at 70; and, therefore, (3) "[g]iven the Grievant's efforts to obtain a relief Officer before he left his post, the Employer's decision to treat the Grievant's actions as constituting an 'abandonment' of his post in violation of Post Orders . . . is found to have been arbitrary, capricious, unfair and, for these reasons, did not constitute just cause . . . ." *Id.*

The Arbitrator further concluded that only Preeminent, not D.C., was responsible for Officer Moore's termination because only Preeminent was his employer. *Id.* at 69-70. In this respect, the Arbitrator essentially distinguished between D.C.'s right to demand that an employee be removed from its contract and site and Preeminent's contractual obligation to fire an employee only for just cause. *Id.* Certainly the Arbitrator's decision that Preeminent did not have just cause to fire Officer Moore was well within his authority and will be fully respected by this Court.

The question lies, however, with the remedy the Arbitrator ordered and the express contract language the parties agreed will govern in the event that D.C. orders an employee off its site but there is not just cause for his discharge. In beginning this analysis, the Court notes that the collective bargaining agreement in question is the 2016 Washington D.C. Public Sectors 1 and 3 Security Agreement. *See* CBA at 15-42. Neither the collective

bargaining agreement nor the parties explain with whom Local 32BJ negotiates this multiemployer contract; Preeminent became a signatory when it became a security contractor to D.C. in Public Sector 1 or 3. The point of this digression is that Preeminent did not negotiate the terms of the agreement to which it is signatory and any arbitral victory may be cited by the Union, or any signatory employer, as relevant to a future arbitration. Nonetheless, the Union cited no prior decisions that support the remedy imposed in the Moore Arbitration.

That may not be as unusual as it sounds inasmuch as the parties specifically agreed what to do in the case of such an eventuality as presented by the Moore Arbitration:

> The Union recognizes that the Employer provides a service of critical importance to the customer. If a customer or tenant demands that the Employer remove an Employee from further employment at an account or location, the Employer *shall have the right to comply with such demand.* However, *unless the Employer has cause to discharge the employee, the Employer will place the employee in a job at another account or location* covered by this Agreement without loss of seniority or reduction in pay or benefits.

CBA at 22.

The remedy ordered by the Arbitrator directly contradicts these terms of the collective bargaining agreement. First, the Arbitrator found the absence of traditional just cause and then ordered a traditional remedy, directing "the Employer to rescind the termination of the Grievant and reinstate him to his former position and make him whole." Arbitration Decision at 65. He then appeared to recognize Preeminent's "claim that, because of the terms of the City-wide contract between the Employer and the D.C. Government," D.C. had directed Preeminent to remove Officer Moore from St. E's and any other location covered by the City-Wide Contract. *Id*. What he did *not* do was to address the parties' own bargain: by reference, interpretation, or otherwise.

13

In point of fact, as quoted above, the collective bargaining agreement demonstrates that the negotiating parties recognized D.C.'s authority—with or without cause—to order a Preeminent employee off its contract, site, and all other locations under the City-Wide Contract. The arbitration remedy robs Preeminent of its bargained-for "right to comply with such [a] demand." CBA at 22. This is not a question of interpreting the City-Wide Contract but rather applying the negotiated terms of the collective bargaining agreement that directly applied and from which the Arbitrator drew his authority. The Arbitrator was required to recognize the negotiators' careful and express attentions to the equities: for the employee who somehow got a removal order from the contracting officer's technical representative but did not present just cause for termination, and for the subcontractor, obliged to remove the employee by the terms of the commercial City-Wide Contract. Notably, the Union contests neither that D.C. ordered that Officer Moore be removed from the St. E's contract, nor the related consequence under the City-Wide Contract that Officer Moore could not be placed at another City site under that commercial contract.

The negotiating parties foresaw just this predicament. First, the Court recognizes that the Arbitrator's decision that there was not just cause for Officer Moore's termination was completely within his authority. Preeminent and other signatories are now advised that they must instruct their security officers on more strict enforcement of pre-existing or new Post Orders before discharge might be enforceable and that discipline short of discharge might be considered.

Second, the Arbitrator mistakenly thought it relevant that "there is no evidence presented that the D.C. Government conducted its own independent investigation of the facts involved in the Grievant's decision to vacate his post in order to seek treatment for his asthma

14

condition before it ordered the Employer to remove him . . . ." Arbitration Decision at 71. Nothing in the CBA between Preeminent and the SEIU imposes such an obligation on the District and it had no role in the arbitration. The collective bargaining agreement expressly states that Preeminent may comply "[i]f a customer or tenant demands that the Employer remove an Employee from further employment at an account or location." CBA at 22. No prior involvement of the customer, much less an investigation into its subcontractor's labor relations, is stated or contemplated by the express negotiated language.[6]

Third, the Arbitrator devised his own remedy which parted in material ways from the parties' carefully negotiated balance of rights. It must be acknowledged that the Arbitrator's remedy is logical: pay backpay and ask D.C. if it will take Officer Moore back. But such a remedy contradicts the parties' expressly bargained-for terms regarding how to resolve the situation. Every collective bargaining relationship is built on compromise. Given the requirements of the City-Wide Contract, by which D.C. retained the right to order the removal of a worker from its site and its contract, the Union agreed to mitigating steps to assist an affected employee. Accordingly, Preeminent was required to place Officer Moore at another location covered by the same terms and conditions, or if such a location were not available, to offer Officer Moore a position in a lower wage category or with lesser benefits. CBA at 22. The Arbitrator did not address and reject these explicit terms; he ignored them altogether.

---

[6] The Arbitrator noted Preeminent's responsibility to decide just cause for termination. He commented that "that determination by the Employer is subject to reconsideration by the Employer, based on a grievance protesting the termination" through grievance arbitration. Arbitration Decision at 71. There can be no argument here: just cause for termination is subject to grievance and arbitration, as has happened. Removal from St. E's and/or the City-Wide Contract upon a COTR's demand is not.

15

Arbitration is a creature of contract. A collective bargaining agreement is a special kind of contract and grievance arbitration is its heart. Nonetheless, an arbitrator cannot go beyond the terms of the contract. "An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. at 597. Because the Arbitrator here ignored the parties' carefully negotiated remedy and fashioned his own, his award must be rejected in part.

## IV. CONCLUSION

The Motion to Vacate will be granted in part and denied in part. The Cross Motion to Enforce Arbitration Award will be granted in part and denied in part. The arbitrator's finding that Preeminent did not have just cause to fire Officer Moore was within his authority and will be upheld. However, the arbitrator's award of backpay and a request that D.C. take back Officer Moore exceeded the bounds of his authority and runs counter to the parties' express bargain; it will be vacated. The matter will be remanded to the arbitrator for reconsideration in light of the Court's Memorandum Opinion.


Date: September 10, 2018  
_____  
ROSEMARY M. COLLYER  
United States District Judge